# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| GEORGE ANTAKI, M.D., an individual;<br><br>Plaintiff,<br><br>vs.<br><br>SAINT FRANCIS MEDICAL CENTER, a Nebraska not-for-profit corporation;<br><br>Defendant. | 8:17CV146<br><br>MEMORANDUM AND ORDER |

This matter is before the Court on the Defendant's Motion for Summary Judgment, ECF No. 23. For the reasons stated below, the Motion will be granted and this action will be dismissed, with prejudice.

## BACKGROUND

The following facts are those stated in the parties' briefs, supported by pinpoint citations to evidence in the record, and admitted, or not properly resisted, by the opposing party as required by NECivR 56.1[1] and Federal Rule of Civil Procedure 56.[2]

---

[1] See NECivR 56.1(b)(1) (effective December 1, 2015):

> The party opposing a summary judgment motion should include in its brief a concise response to the moving party's statement of material facts. The response should address each numbered paragraph in the movant's statement and, in the case of any disagreement, contain pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies. <u>Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response.</u>

[2] Plaintiff George Antaki, M.D., submitted a broad denial of several of Defendant's asserted facts. He stated

> Dr. Antaki contests no. 23, 25, 26, 27, 30,31, 32, 33, 34, 35, 36, 37, 38 40, 42, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55,56, 57, 58, 61, 62, 63, 64, 66, 67, 71, 72, 73, 75, 76, 83 as the statements lack personal, first-hand knowledge, are generalizations, speculation, conjecture, hearsay or multiple hearsay, and lacking foundation (who, when where, what, why) for admissibility and not useable for summary judgment purposes.

Defendant Saint Francis Medical Center (Saint Francis) is a hospital in Grand Island, Nebraska. Grand Island Radiology Associates, P.C. (GIRA) is a radiology medical practice in Grand Island, and it conducts radiology services at Saint Francis. GIRA hired Dr. Antaki as a radiologist in March 2008. As a radiologist for GIRA, Dr. Antaki—and its other radiologists—worked at Saint Francis and at an off-site imaging center in Grand Island. The group's radiologists also read studies for other medical providers in the region.

## A. Radiology Services Agreement

Saint Francis and GIRA entered into an Exclusive Radiology Services Agreement (the "Services Agreement"), dated September 29, 2006.[3] *See* Services Agreement, ECF No. 25-3, Page ID 203-29. Under the terms of the Services Agreement, GIRA was the exclusive provider of radiology services and radiologists for Saint Francis at all times relevant to this matter. GIRA agreed to provide a medical director for Saint Francis's radiology department, who would oversee and work with Saint Francis's non-physician radiology department staff. In turn, Saint Francis agreed to permit radiology staff to assist and serve GIRA's radiologists while working in the radiology department.

Under the Services Agreement, GIRA agreed to comply with the Catholic Health Initiatives (CHI) Standards of Conduct and agreed that those standards were applicable to each Covering Physician. Services Agreement at 8-9, § 2.8, ECF No. 25-3, Page ID 210-11. Each physician at GIRA, including Dr. Antaki, signed an Acknowledgement and

---

Dr. Antaki's blanket denial fails to controvert any specific allegation. The Court has reviewed each of the identified statements, the cited evidence in support, and has considered those statements that the Court has found to be relevant, admissible, and supported by the record.

[3] In the Services Agreement, Saint Francis is referred to as the "Hospital" and GIRA is the "Contractor."

Certification (Acknowledgement), attached as Exhibit 1 to the Services Agreement. As part of the Acknowledgement, each physician agreed to the CHI Standards of Conduct. *See* ECF No. 25-3, Page ID 231. The CHI Standards of Conduct were identical to the Saint Francis Medical Center Medical Staff Professional Conduct Standards (Conduct Standards). Each radiologist with privileges at Saint Francis, including Dr. Antaki, agreed to uphold those standards. Under the Conduct Standards, Dr. Antaki and the other radiologists agreed to "[t]reat colleagues, consultants, nurses, clinical and other support staff with respect as team members working to care for our mutual patients. Handle disagreements civilly, professionally and through established mechanisms. Seek to understand where processes may have failed." ECF No. 25-3, Page ID 284.

Under § 2.8 of the Agreement, if Saint Francis determined that those standards were violated by GIRA or any of its physicians, Saint Francis had the right to terminate the Services Agreement for cause. ECF No. 25-3, Page ID 211. The Services Agreement stated that if Saint Francis, in good faith, determined that a physician breached his obligations to comply with the Standards of Conduct, then GIRA "shall, upon notice from Hospital, immediately exclude the Covering Physician from the performance of any services required by this Agreement." *Id*.

## B. Dr. Antaki's Behavior at Saint Francis

Shortly after Dr. Antaki was hired, his behavior became a concern for GIRA. Dr. Daniel Novinski, shareholder and president of GIRA, stated that Dr. Antaki did well during his first year, but "had several incidents where he had problems with some of the techs, and complaints. And so after six months, we sat down with him and explained that he's got to work on how he interacts with techs and clinicians." Novinski Dep.

23:21-24:1, ECF No. 25-1.⁴ Because of Dr. Antaki's issues, the other radiologists at GIRA required him to undergo anger management therapy in Grand Island, which he completed along with online programming for anger management. Antaki Dep. 131:12-21, 132:19- 25, 138:23-25, 143:1-6, ECF No. 25-7.

After Dr. Antaki completed anger management, some of his behavior problems continued. For example, one of GIRA's radiologists, Dr. David Hadford, stated "[I]f George [Antaki] was on rotation and I was on the other one, all the techs would be coming to me . . . . they didn't want to interact with Dr. Antaki." Hadford Dep. 13:7-15, ECF No. 25-15. Dr. Hadford explained this was because "Dr. Antaki would yell at them." *Id.* 13:17, 26:24). Another radiologist, Dr. Cody Evans, testified that he "was told, from technologists, [that Dr. Antaki] was difficult to work with; that he was – not all of them, but he was sometimes rude, and I had heard of two potential, I guess, physical touching of female technologists." Evans Dep. 13:18-22, Page ID 25-16.

Jenna Coe, an x-ray student and, after graduation, a technologist at Saint Francis, had several interactions with Dr. Antaki. For example, as an x-ray student at Saint Francis, she presented information about a patient to Dr. Antaki. Dr. Antaki yelled at her because she did not tell him one of the patient's lab values. She stated in her affidavit that she was just starting and learning and did not know that would have been important to Dr. Antaki. She was thereafter wary of interacting with him. Coe Aff. ¶ 7, 25-17. Coe asserted that her interactions with Dr. Antaki were always negative. *Id.* ¶ 8. During one occasion, as Coe was leaving Saint Francis after a shift, Dr. Antaki

---

⁴ Because the headings of the deposition pages and the CM/ECF Page ID header overlap, the Page ID number is difficult to identify. Accordingly, the Court's references to depositions refer solely to the deposition page and line number.

confronted her in the hallway about a study she had done. *Id.* ¶ 10. She apologized but he followed her, continuing to belittle and criticize her. *Id.* Coe reported the incident to Ron Neseth, Saint Francis's radiology department imaging manager. *Id.*

In addition to verbal complaints to Neseth about Dr. Antaki's behavior, Coe also reported the abuse to her direct supervisor in the CT/MRI department, Jodi Nielsen. Coe Aff. ¶¶ 10, 14. Nielsen personally observed Dr. Antaki's conduct and was also subjected to it herself. Nielsen Dep. 24:20-25, 25:12-20, 26:2-24, ECF No. 25-18. Other staff supervisors, such as Ultrasound Supervisor Sheri Hitchler, also received complaints about Dr. Antaki's behavior. Hitchler Dep. 21:2-5, ECF No. 25-20. Hitchler recalled frequent complaints from her staff of Dr. Antaki yelling at them. *Id.* 15:1-16:1. Based on his treatment of Coe, Nielsen, and others, GIRA radiologists instructed Dr. Antaki not to communicate directly with Coe or Nielsen but instead to take any of his concerns to Neseth. Antaki Dep. 148:21-25, ECF No. 25-7.

The radiology group and Neseth frequently discussed the staff's complaints about Dr. Antaki, often at group meetings where Dr. Antaki was present. Neseth Dep. 57:15-58:13, ECF No. 25-19. Dr. Antaki reacted to those issues at the meetings by becoming "very loud." *Id.* 58:14-23. Neseth testified that he could not schedule Dr. Antaki for Mondays if he had worked all weekend on call because he would have such a bad temper. *Id.* 51:8-13. Dr. Antaki's interactions with staff were not typical of other physicians' interactions. *Id.* 50:12-14. Neseth had to make special scheduling accommodations to limit staff exposure to Dr. Antaki. *Id.* 95:9-14.

Neseth also noticed that although Dr. Antaki would frequently complain about staff work product, other radiologists found no bases for the complaints. For example, Neseth testified:

> Usually after Dr. Antaki would make the complaint [about a technologist's image], we would pull up the images on the computers and start going through them.
>
> . . . . Dr. Stevens . . . was in charge of CT/MR [and] I would usually go to him and say, would you pull up the study and tell me what you think, and leave it at that. Then he could come back and say, I think it's fine. I think it was the right call and that. And I would ask him about image quality, and he'd say, no, it's fine.

*Id.* 45:6-17. Neseth testified that this happened "beyond occasionally." *Id.* 45:6-46:24.

Neseth recounted that "typically, after the weekend, I would get calls from the radiology directors from the other towns that Dr. Antaki was upset about one thing or another, maybe not following protocol, maybe image quality, but, typically, it involved him raising his voice and yelling." *Id.* 51:19-25. Neseth recalled specific incidents of Dr. Antaki becoming "verbally abusive" and raising his voice enough that multiple people would have heard. *Id.* 51:19-52:14. Neseth testified that "Dr. Antaki routinely was upset, yelling, would come to me and say, you need to fire these people, and/or threaten that he would fire these people, and that's not normal behavior." *Id.* 67:18-68:7.

In October 2013, Neseth became aware of a call from Dr. Antaki to a nurse on the floor of the radiology department. Neseth testified that Dr. Antaki yelled at the nurse over the phone, "and that the nurse took the opportunity to hold the phone out, away from her ear, so other people could witness his yelling at her, for, basically, inappropriately ordering an exam that did not need to be done during the weekend." *Id.* 70:13-19. The incident was reported to Dr. Michael Hein, Saint Francis's chief medical

6

officer, and some of the other radiologists at GIRA. Antaki Dep. 179:3-12, ECF No. 25-7; Novinski Dep. 120:6-7, ECF No. 25-1.

On January 7, 2014, Louise Burson, an employee in the scheduling/patient access department at Saint Francis, received a phone call from Dr. Antaki who was upset about how a procedure was scheduled and he demanded that a scheduler be written up for what Dr. Antaki perceived as an error. Burson Aff. ¶¶ 7-8; ECF No. 25-21. Burson recalled that Dr. Antaki yelled and cursed during the call, and accused the schedulers of being "incompetent and dumb." *Id.* ¶ 6. Dr. Antaki yelled so loudly that Burson had to pull the phone from her ear and other schedulers in the room with her could hear Dr. Antaki's yelling. *Id.* ¶ 9. Burson discussed the call with her supervisor, Anna Novotny, and then emailed a description of the encounter to Novotny. *Id.* ¶ 10; Ex. A, ECF No. 25-21, Page ID 526. Novotny forwarded Burson's email to Dale Hartwig, Saint Francis's Vice President of Ancillary Services; Jackie Huldt, director of radiology; Kara Urkoski, Novotny's direct supervisor; Neseth; and Dr. Novinski. Novotny Aff. ¶ 5, ECF No. 25-22, Page ID 530-31.

## C. The McElligott Letter

Following Burson's encounter and Novotny's report of it, on approximately January 8, 2014, Saint Francis's leadership called a meeting with GIRA's leaders to discuss Dr. Antaki's conduct. Novinski Dep. 50:15-20, 51:3-8, 67:24-68:7, ECF No. 25-1. Dr. Novinski and Dr. Marsh, another shareholder at GIRA, attended the meeting with the hospital's president, Daniel McElligott. *Id.* 50:15-20, 51:3-8, 67:24-68:7. Hartwig and Dr. Hein also attended the meeting. *Id.* 61:5-7; Hartwig Dep. 32:17-33:7, ECF No. 25-2. During the meeting, Dr. Hein expressed concern about Dr. Antaki's anger, opining that

7

Dr. Antaki was a disruptive physician, and that he might be a good radiologist but a bad physician if he was not working well with staff. Novinski Dep. 62:11-17, ECF No. 25-1.

Although the hospital's leadership expressed their concerns and demanded improvement in his behavior, no one demanded that Dr. Antaki be fired. *Id.* 63:1-13. Hartwig explained at the meeting that he "didn't want [Dr. Antaki] subjecting the staff, patients, and our organization to his behavior anymore." Hartwig Dep. 35:19-21, ECF No. 25-2. Saint Francis's leaders noted previous incidents of Dr. Antaki's conflicts with staff. Marsh Dep. 19:2-7, ECF No. 25-14. McElligott informed Dr. Marsh and Dr. Novinski that the hospital could not have disruptive physicians. *Id.* 19:20-22. Dr. Marsh and Dr. Novinski asked Dr. Hein and McElligott for more details about the hospital's concerns. *Id.* 21:14-20. Saint Francis's leaders informed the radiologists they would send a letter with additional information. *Id.*

On January 15, 2014, McElligott sent a letter to Dr. Novinski (the "McElligott Letter") setting forth the hospital's concerns. ECF No. 25-11, Page ID 429-30. The letter stated, in pertinent part:

> This letter is a formal request for you and your partners to immediately address ongoing behavioral and professional issues by Dr. George Antaki that have created a hostile work environment for some employees of Saint Francis Medical Center. These behaviors are a breach of the Catholic Health Initiatives Standards of Conduct, which under provision of Section 2.8 of our Exclusive Radiology Services Agreement, every provider in the group has agreed to abide by.
>
> We are aware that there have been several attempts to address these behaviors in the past, but our perspective, based upon recent feedback and inquiry, is that the desired modifications of behavior and professionalism have failed to rectify the underlying issues and the hostile work environment persists.
>
> . . .

8

> This letter should serve as notice that we are prepared to initiate the clauses in the [Services Agreement] that would rectify the situation, should any modifications fail to result in marked, immediate, and persistent improvement in the perceived culture of safety by our staff.

*Id.* Attached to the letter was an addendum (the "Addendum") with several examples to substantiate Saint Francis's concerns, such as:

- Dr. Antaki accused staff of being 'back-stabbers' and this done in a public setting so that others hear such comments.

- He targets specific technologists for criticism of the quality of exams, while, when unaware of such, reads the same examinations as adequate when he believes those technologists he favors performed them.

- Staff do not raise questions or ask for direction for fear of retaliation, thus introducing opportunity for error.

- He resists establishing standardized protocols, which have been demonstrated to be evidence-based, effective tools for reducing variation and harm.

- The majority of staff do not like to address him because they are afraid of getting yelled at, belittled or blamed for something if they approach him. Staff will seek out other radiologists to help them.

- Staff get yelled at or ignored when they ask him to read right away, have a patient waiting, or need him for a procedure.

- He is quick to react negatively if things are not to his liking.

- He becomes argumentative when staff or management is trying to explain situations.

- If he does not like a situation or comment he becomes very defensive and rude.

ECF No. 25-11, Page ID 431. The information in the Addendum was based on an e-mail sent to Hartwig by Jackie Huldt, director of radiology, at Hartwig's request. Huldt Dep. 65:10-18, ECF No. 25-4; Hartwig Dep. 21:11-24, ECF No. 25-2.

9

After receiving the Letter, Dr. Novinski called a meeting of GIRA shareholders, excluding Dr. Antaki, to make a decision about how to respond. Novinski Dep. 75:23-76:3, ECF No. 25-1. Those in the group considered three options. One, they could do nothing and let the hospital take action, knowing Saint Francis might choose not to renew the Services Agreement when it was due for renewal later in 2014. Marsh Dep. 32:19-24, ECF No. 25-14. Two, they could let Saint Francis discipline Dr. Antaki, which they believed would put his medical license and ability to get a future job at risk. *Id.* 32:25-33:2. Three, they could offer Dr. Antaki the choice to resign, which would preserve the group's contract with Saint Francis and not harm Dr. Antaki's future job prospects. *Id.* 33: 3-5, 31:13-23. The shareholders chose the third option, and gave Dr. Antaki the option to resign from GIRA rather than be terminated. Novinski Dep. 101:10, 107:18-20, ECF No. 25-1.

Dr. Antaki submitted a letter of resignation from employment at GIRA, dated February 8, 2014. He ceased working for the group and the hospital immediately upon his resignation. Soon after his resignation, he moved back to Florida, where his family resided, and started a new job in Florida on July 10, 2014.

Dr. Antaki filed his Complaint on April 26, 2017. Compl., ECF No. 1. Dr. Antaki asserts that Saint Francis's action in sending the McElligott Letter tortiously interfered with Dr. Antaki's business relationship with GIRA. Saint Francis moved for summary judgment on Dr. Antaki's claim.

## STANDARD OF REVIEW

"Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law." *Garrison v. ConAgra Foods Packaged Foods, LLC*, 833 F.3d 881, 884 (8th Cir. 2016) (citing Fed. R. Civ. P. 56(c)). "Summary judgment is not disfavored and is designed for every action." *Briscoe v. Cty. of St. Louis*, 690 F.3d 1004, 1011 n.2 (8th Cir. 2012) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc)). In reviewing a motion for summary judgment, the Court will view "the record in the light most favorable to the nonmoving party . . . drawing all reasonable inferences in that party's favor." *Whitney v. Guys, Inc.*, 826 F.3d 1074, 1076 (8th Cir. 2016) (citing *Hitt v. Harsco Corp.*, 356 F.3d 920, 923–24 (8th Cir. 2004)). Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 618 (8th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The moving party need not produce evidence showing "the absence of a genuine issue of material fact." *Johnson v. Wheeling Mach. Prods.*, 779 F.3d 514, 517 (8th Cir. 2015) (quoting *Celotex*, 477 U.S. at 325). Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 596 (8th Cir. 2001) (quoting *Celotex*, 477 U.S. at 325).

In response to the moving party's showing, the nonmoving party's burden is to produce "specific facts sufficient to raise a genuine issue for trial." *Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 884 (8th Cir. 2016) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012)). The nonmoving party "must do

more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Wagner v. Gallup, Inc.*, 788 F.3d 877, 882 (8th Cir. 2015) (quoting *Torgerson*, 643 F.3d at 1042). "[T]here must be more than the mere existence of some alleged factual dispute" between the parties in order to overcome summary judgment. *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Vacca v. Viacom Broad. of Mo., Inc.*, 875 F.2d 1337, 1339 (8th Cir. 1989)).

In other words, in deciding "a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Wagner*, 788 F.3d at 882 (quoting *Torgerson*, 643 F.3d at 1042). Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no "genuine issue of material fact" for trial and summary judgment is appropriate. *Whitney*, 826 F.3d at 1076 (quoting *Grage v. N. States Power Co.-Minn.*, 813 F.3d 1051, 1052 (8th Cir. 2015)).

## DISCUSSION

Under Nebraska law,[5] to succeed on a claim for tortious interference with a business relationship or expectancy, Dr. Antaki must prove (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted. *Steinhausen v. HomeServices of Neb., Inc.,* 857 N.W.2d 816, 831 (Neb. 2015). Saint Francis argues

---

[5] The parties agree that Dr. Antaki's claim is governed by Nebraska law.

that Dr. Antaki cannot prove the third element because Saint Francis's actions were proper and justified under the circumstances.

"In order to be actionable, interference with a business relationship must be both intentional and unjustified. An intentional, but *justified,* act of interference will not subject the interferer to liability." *Recio v. Evers*, 771 N.W.2d 121, 132 (Neb. 2009) (emphasis in original).[6] The Nebraska Supreme Court has held that, as a matter of law, an actor does not improperly interfere with a business relationship by providing "(a) truthful information, or (b) honest advice within the scope of a request for the advice." *Sulu*, 879 N.W.2d at 682. The parties agree that the McElligott Letter is the alleged tortious action in this case. *See* Pl. Br. at 33, ECF No. 34, Page ID 72 ("As recognized by both parties, the Hospital's sending GIRA the McElligott Letter was the conduct that interfered with Dr. Antaki's employment and got him terminated."). Viewing the evidence in a light most favorable to Dr. Antaki, the undisputed evidence shows that the McElligott Letter was justified.[7] First, the information in the

---

[6] The Nebraska Supreme Court has adopted the seven-factor balancing test of the Restatement (Second) of Torts § 767 (1979) to determine whether interference is "improper" or "unjustified" under Nebraska law. *Recio*, 771 N.W.2d at 132. The factors include, but are not limited to:

> (1) the nature of the actor's conduct, (2) the actor's motive, (3) the interests of the other with which the actor's conduct interferes, (4) the interests sought to be advanced by the actor, (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (6) the proximity or remoteness of the actor's conduct to the interference, and (7) the relations between the parties.

*Id.* The issue in each case is "whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another. The decision depends upon a judgment and choice of values in each situation." *Id.* at 419 (internal citations omitted). Thus, Nebraska courts do not rigidly apply the factor test to determine whether an alleged interference was improper. *See, e.g., See, e.g., Sulu v. Magana*, 879 N.W.2d 674, 682 (Neb. 2016); *Recio*, 771 N.W.2d at 133; *Huff v. Swartz*, 606 N.W.2d 461, 470 (Neb. 2000); *DeLay First Nat. Bank & Tr. Co. v. Jacobson Appliance Co.*, 243 N.W.2d 745, 752 (Neb. 1976). In this case, following the reasoning in *Sulu* and *Recio*, the Court does not discuss each factor individually.

[7] This Court has previously stated that "[s]uch a fact-intensive, comparative appraisal is not suitable for resolution on a motion for summary judgment." *Trimble v. BNSF Ry. Co.*, 636 F. Supp. 2d

13

McElligott Letter was substantially truthful. Second, Saint Francis provided the information in the Letter in good faith and within its rights under the Services Agreement.

## I. Truthfulness of the McElligott Letter

"[A] person does not incur liability for interfering with a business relationship by giving truthful information to another." *Recio*, 771 N.W.2d at 133. To survive summary judgment, a nonmoving party must demonstrate that information provided "was demonstrably false." *Id.* at 134. This cannot be accomplished solely by identifying inconsistencies in the record. *Id.* In opposing summary judgment, the plaintiff in *Recio* set forth "at length, supposed factual inconsistencies and improper behavior" and described "a narrative in which [the defendant's] sexual harassment complaint [was] only part of a larger campaign of persecution directed at" the plaintiff. *Id.* at 133-34. The court held that neither the supposed inconsistencies nor the fact that the plaintiff remembered or interpreted events differently were sufficient to create a genuine issue of material fact. *Id.* at 134. The court concluded that although the plaintiff generally denied the substance of the sexual harassment claim, the defendant's "brief, and the record as a whole, [were] notably short on instances in which [the defendant's] complaint was demonstrably false." *Id.*

Here, as in *Recio*, Dr. Antaki's assertions and the record as a whole do not show that the content of the McElligott Letter and the Addendum was demonstrably false. Saint Francis's Index contains ample evidence of the behavior described in the McElligott Letter and its Addendum. Therefore, the burden shifted to Dr. Antaki to

---

916, 925 (D. Neb. 2009). However, Nebraska courts have regularly granted and affirmed summary judgment in tortious interference cases where evidence is uncontroverted. *See, e.g., Sulu*, 879 N.W.2d at 682; *Recio*, 771 N.W.2d at 133; *Huff*, 606 N.W.2d at 470.

"produce admissible contradictory evidence showing the existence of a material issue of fact that prevents judgment as a matter of law." *Sulu*, 879 N.W.2d at 683. Dr. Antaki filed a lengthy brief, setting forth numerous supposed factual inconsistencies. However, like the defendant in *Recio*, Dr. Antaki failed to show that the allegations in the McElligott Letter were demonstrably false. Dr. Antaki argued that he has a "different recollection" of certain events, but provided no evidentiary support for his position.[8] *See, e.g.*, Pl. Br. at 13, ECF No. 34, Page ID 703. As stated in *Recio*, a difference in recollection or interpretation of events is insufficient to defeat summary judgment. Although Dr. Antaki attacks the foundational basis for the assertions in the Addendum, "there is nothing in the record that substantially contradicts the factual basis" of the McElligott Letter. *See Recio*, 771 N.W.2d at 134. Accordingly, Dr. Antaki has not shown that the allegations were demonstrably false.

## II. Actions Taken in Good Faith, Within the Scope of the Services Agreement

Even if there were some dispute about the particulars of the McElligott Letter, Saint Francis had a right to provide feedback regarding its perception of Dr. Antaki's performance. A communication is not improper if it is made pursuant to a legal obligation or lawful right. *See Wiekhorst Bros. Excavating & Equip. Co. v. Ludewig*, 529 N.W.2d 33, 40 (1995). In *Wiekhorst Bros.*, the Nebraska Supreme Court held that, absent a showing of bad faith or malice, "design professionals acting within the scope of their contractual obligations are privileged to give the owner advice which may lead to the termination of a contractor." 529 N.W.2d at 40. The Nebraska Supreme Court has

---

[8] For example, Dr. Antaki claims that allegations that he was condescending and difficult were "opinion" and lacked specific examples. Pl. Br. at 22, ECF No. 34, Page ID 712. Dr. Antaki also asserted that fear of retaliation was unjustified because he lacked the ability to fire or hire radiology technicians. Pl. Br. at 12, ECF No. 34, Page ID 702. These statements do not refute the truthfulness of the assertions in the Letter.

recognized that this holding goes beyond the design professional/contractor relationship. *Recio*, 771 N.W.2d at 132 (citing *Wiekhorst*, 529 N.W.2d at 40). Dr. Antaki has not demonstrated any bad faith or malice on the part of Saint Francis. Further, Saint Francis's action in sending the McElligott Letter was within the scope of the Services Agreement.

### A. Absence of Bad Faith or Malice

Where the nature of a third party communication is to avoid potential injury rather than interfere with a business expectancy, such a communication is not improper. *Macke v. Pierce*, 661 N.W.2d 313, 320 (Neb. 2003) (holding that a physician's telephone call to the plaintiff's employer "was in the 'nature' of ensuring that [the plaintiff] avoided subsequent injury, rather than an intentional act to deprive [the plaintiff] of employment."). Further, where an actor validly relays information about an employee's job performance, such communication is not improper. *See Huff v. Swartz*, 606 N.W.2d 461, 468 (Neb. 2000). For example, in *Huff*, the defendant, plaintiff's manager and co-employee, contacted personnel at their employer's facility in Louisiana, where the plaintiff had recently worked, to discuss the plaintiff's performance deficiencies at the Omaha facility. *Huff*, 606 N.W.2d at 464-65. The plaintiff sued the defendant manager, alleging that his contact with personnel at their employer's Louisiana facility interfered with the plaintiff's business relationship with their employer. *Id.* The court concluded that, as a matter of law, the defendant manager had authority to discuss the plaintiff's job performance and potential transfers to other facilities. *Id.* at 469. The court reasoned that "there [was] no evidence that [the defendant manager]

pursued the topic of transferring [the plaintiff] for any reason other than perceived deficiencies in [the plaintiff's] job performance at the Omaha facility." *Id.*

Here, the McElligott Letter was not "in the nature of" an intentional act to deprive Dr. Antaki of employment. The Letter was a specific response to a request for information from GIRA shareholders regarding Dr. Antaki's problem behavior. Further, while the Letter requested that GIRA take action to improve Dr. Antaki's behavior, it did not suggest that GIRA terminate his employment. The Letter contemplated his continued presence at Saint Francis, specifically referencing an opportunity for immediate and persistent improvement. The stated purpose of the Letter was to improve cohesion, communication, and effectiveness within the radiology department.

There is no evidence that Saint Francis contacted GIRA for any reason other than to discuss deficiencies in Dr. Antaki's demeanor with hospital staff. Like the manager's communications in *Huff*, the McElligott Letter was not motivated by anyone's desire for personal gain, but was intended to improve St. Francis employees' working environment. Dr. Antaki provided no evidence that Saint Francis acted for any reason other than the lawful purpose of protecting its patients and employees.

Dr. Antaki argues that, due to conflicts in testimony about administrative procedures and allegations, a jury must decide what motivated the McElligott Letter. He broadly disputes whether the allegations against him were true, and suggests that Saint Francis failed to follow procedure when meeting with GIRA and subsequently sending the McElligott Letter.[9] Yet Dr. Antaki fails to identify any potential improper motive that

---

[9] Dr. Antaki suggests that Saint Francis violated his right to a hearing based on the complaints of his behavior. However, in signing the Services Agreement, Dr. Antaki expressly waived any hearing rights

17

could be inferred from the nature and circumstances of the letter. In a tortious interference case, mere assertion of improper motive is insufficient to defeat summary judgment. *Jensen v. Insur, Inc.*, No. A-02-1411, 2004 WL 2216486, at *9 (Neb. Ct. App. Oct. 5, 2004) (citing *Darrah v. Bryan Memorial Hosp.,* 571 N.W.2d 783, 787 (Neb. 1998)). Such assertions of personal benefit without evidence "amount to mere conjecture or speculation" and "do not create a material issue of fact precluding summary judgment." *Id.* at *8-*9.

### B. Saint Francis's Contractual Right to Send the Letter

Under the express terms of the Services Agreement, Saint Francis had a right and, in some circumstances, a contractual obligation to provide notice to GIRA of Dr. Antaki's potential violations. As noted above, "professionals acting within the scope of their contractual obligations are privileged to give the owner advice which may lead to the termination of a contractor." 529 N.W.2d at 40. Under the terms of the Services Agreement, GIRA and its physicians agreed to comply with the CHI Standards of Conduct and the identical Saint Francis Conduct Standards. Agreement at 8, ECF No. 25-3, Page ID 210. The Standards of Conduct included a requirement that physicians "[t]reat colleagues, consultants, nurses, clinical and other support staff with respect as team members . . . . Handle disagreements civilly, professionally and through established mechanisms. Seek to understand where processes may have failed." ECF No. 25-3, Page ID 284. Under the express terms of the Services Agreement, if Saint Francis "determines in good faith that a Covering Physician has breached his or her obligations pursuant to [the Standards of Conduct], Contractor shall, *upon notice from*

---

available to him under any other contractual arrangement. *See* Services Agreement, ECF No. 25-3, Page ID 258-59.

*Hospital*, immediately exclude the Covering Physician from the performance of any services required by this Agreement." ECF No. 25-3, Page ID 211 (emphasis added).

The record establishes Saint Francis's good faith belief that Dr. Antaki may have violated the Standards of Conduct. Dr. Antaki has not refuted Saint Francis's good faith belief. The Services Agreement permitted and, in some circumstances, obligated Saint Francis to provide notice to GIRA of such violations. The McElligott Letter served as that notice and was within the scope of Saint Francis's rights under the Services Agreement.

## CONCLUSION

No evidence demonstrates that the content of the McElligott Letter was demonstrably false, and no evidence shows that Saint Francis sent the Letter for any reason other than to address Dr. Antaki's behavior. Saint Francis acted in good faith and within its contractual rights when it sent the McElligott Letter. Accordingly, St. Francis is entitled to summary judgment on Dr. Antaki's claim for tortious interference.

IT IS ORDERED:

1. The Defendant's Motion for Summary Judgment, ECF No. 23, is granted;
2. This action is dismissed, with prejudice; and
3. A separate judgment will be entered.

Dated this 21st day of March, 2018.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge